zHARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

MARK GERAGOS (SBN: 108325)
mark@geragos.com
BEN J. MEISELAS (SBN: 277412)
ben@geragos.com
MATTHEW VALLEJO (SBN: 322713)
vallejo@geragos.com
GERAGOS & GERAGOS,
A Professional Corporation
644 South Figueroa Street
Los Angeles, CA 90017-3411
Phone: (213) 625-3900
Fax: (213) 232-3255

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR

# THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Z GOLF FOOD & BEVERAGE SERVICES, LLC** d/b/a Wedgewood Weddings, a California limited liability company; **GRAND TRADITION d/b/a GRAND TRADITION RESTAURANT AND WEDDINGS,** a California corporation; and **AARON** | Case No.: 5:20-cv-01224 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1



Complaint

Case No.

**TEXEIRA d/b/a A PERFECT IMPRESSION PHOTOGRAPHY, DJ, AND VIDEO**,

               Plaintiffs,

               v.

**GAVIN NEWSOM**, in his official capacity as the Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **SONIA Y. ANGELL**, in her official capacity as the State Public Health Officer and Department of Public Health Director,

               Defendants.

---

*Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.  Loving v. Virginia*, 388 U.S. 1, 12 (1967).

NOW COME the above-named Plaintiffs Z Golf Food & Beverage Services, LLC d/b/a/ as Wedgewood Weddings ("Wedgewood Weddings"), a California limited liability company, Grand Tradition d/b/a "Grand Tradition Restaurant and Weddings," a California corporation, and Aaron Texeira d/b/a A Perfect Impression DJ, Photography, and Video ("A Perfect Impression"), by and through their attorneys, Dhillon Law Group, Inc., as and for claims against the above-named Defendants Gavin Newsom, in his official capacity as the Governor of California; Xavier Becerra, in his official capacity as the Attorney General of California; Sonia Y. Angell, in her official capacity as the State Public Health Officer and Department of Public Health Director, allege and show the Court as follows (this "Complaint").



---

2

Complaint                                            Case No.

**NATURE OF ACTION**

1.     Defendants have abused their power by using the Coronavirus pandemic to expand their authority by unprecedented lengths, depriving Plaintiffs and all other residents of California of fundamental rights protected by the U.S. Constitution, particularly with respect to the Equal Protection Clause of the Fourteenth Amendment, and (2) the Due Process Clause of the Fifth and Fourteenth Amendments It is this Court's duty to defend these constitutional principles, by safeguarding the many rights and liberties of Californians that Defendants have violated and continue to violate.

2.     This Action presents facial and as-applied challenges to the Governor of California's May 4, 2020 Executive Order N-60-20 ("State Order") which incorporated the May 7, 2020 State Public Health Order. Both Orders are attached, respectively, as Exhibits 1 and 2.

3.     The State Order and Defendants' enforcement thereof infringe upon (1) the Equal Protection Clause of the Fourteenth Amendment, and (2) the Due Process Clause of the Fifth and Fourteenth Amendments.

**JURISDICTION AND VENUE**

4.     This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' constitutional rights under (1) the Equal Protection clause of the Fourteenth Amendment, and (2) the Due Process Clause of the Fifth and Fourteenth Amendments. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

5.     The Central District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which Defendants maintain offices, exercise their authority in their official capacities, and will enforce the State Order; and it is the District in which substantially all of the events giving rise to the claims occurred.

3



Complaint                                                            Case No.

**PARTIES**

6.      Plaintiff Wedgewood Weddings is a limited liability company incorporated in California. Wedgewood Weddings has its beginnings in Ventura County, from where it grew into twenty-eight locations across California and fifteen more branches across the nation. Its venues in Ventura and Los Angeles County account for at least fifteen percent of Wedgewood Weddings' profits. It has two venues in Ventura County. It also has three venues in Los Angeles County. It has a footprint of at least one venue respectively in the Counties of Alameda, Contra Costa, El Dorado, Fresno, Marin, Monterey, Orange, Placer, Riverside, Sacramento, San Bernardino, San Diego, Santa Clara, and Solano.

7.      Plaintiff Grand Tradition is a corporation incorporated in California operates wedding venues. It is located in San Diego County. It was founded by the McDougal family in 1984. It owns Grand Tradition Estate & Gardens, a meticulously landscaped, thirty-acre property that the McDougal family has cultivated for the last twenty-five years. Its property is striking, boasting numerous gardens, waterfalls, reception areas, ceremony sites, and even a heart-shaped lake.  Many couples from within and outside California created their most treasured moments here.

8.      Plaintiff Aaron Texeira d/b/a A Perfect Impression Photography, DJ and Video, where he provides media services for weddings, i.e., photography, videography, and providing music. He is based in Contra Costa county. His photography skills, and his business are highly-regarded among brides and the wedding industry. For example, A Perfect Impression has a perfect five-star rating with more than one hundred review on Yelp!.[1]

9.      Defendant Gavin Newsom ("Newsom") is made a party to this Action in his official capacity as the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is

---

[1] Available as of June 15, 2020 at the URL: https://www.yelp.com/biz/a-perfect-impression-danville.

4

Complaint                                                                                          Case No.

faithfully executed." Cal. Const. Art. V, § 1. Governor Newsom signed Executive Order N-33-20 (the "Executive Order") on March 17, 2020. *See, e.g., Ex Parte Young*, 209 U.S. 123 (1908).

10.    Defendant Xavier Becerra ("Becerra") is made a party to this Action in his official capacity as the Attorney General of California. Under California law, Becerra is the chief law enforcement officer with supervision over all sheriffs in the State. Cal. Const. Art. V, § 13.

11.    Defendant Sonia Y. Angell, MD, MPH ("Dr. Angell") is made a party to this Action in her official capacity as the Director and State Public Health Officer. Dr. Angell is sued herein in her official capacity to the extent that she is responsible for providing official government guidance to the various industries that are allowed to operate.

**FACTUAL ALLEGATIONS**

**Newsom Does Not Allow Or Provide**

**Reopening Guidance for Wedding Venues**

12.    On June 12, 2020, the Centers for Disease Control and Prevention ("CDC") provided federal guidelines for wedding venues.[2]

13.    Plaintiff Wedgewood Weddings is currently allowed to operate in all of its wedding venue locations outside California.

14.    For example, New Hampshire allows wedding celebrations with some limitations. (*See* New Hampshire's Reopening Guidance for Weddings.)[3]

---

[2] Available as of the date of filing at https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html.
[3] Available as of the date of filing at https://www.covidguidance.nh.gov/sites/g/files/ehbemt381/files/inline-documents/2020-06/guidance-weddings.pdf.



Complaint                                                                                          Case No.

15. In Colorado, wedding celebrations are also allowed with some limitations.[4]

16. Wedding chapels continue to operate in Nevada.[5]

17. In Texas, wedding celebrations are also allowed with some limitations.[6]

18. In Arizona, wedding celebrations are not outright banned, but have limitations.[7]

19. Wedgewood Weddings follows CDC guidelines for wedding venues at all of its venues outside of California, including but not limited to:

    i. Dedicated exits and entrances;

    ii. Social distancing markers and measures for guests;

    iii. Extensive ventilation;

    iv. Providing hand-washing stations and hand sanitizer;

    v. Thorough disinfection of all spaces and surfaces after every event;

    vi. Monitoring staff for COVID symptoms; and

    vii. Requiring staff to wear masks at all times.

20. In the process of providing guidance to similarly situated industries, allowing them to reopen, Defendants have failed to provide any guidance for wedding venues. This is especially egregious since industries such as dine-in restaurants are able to start operating within days of being permitted to operate, while couples who decide to get married often need months of lead time (if not more) before their special day.

---

[4] Available as of the date of filing at
https://www.thedenverchannel.com/news/coronavirus/wedding-planners-brides-say-they-cant-hold-a-wedding-at-a-venue-with-more-than-10-people.
[5] Available as of the date of filing at
https://www.usatoday.com/story/travel/news/2020/05/08/las-vegas-wedding-chapels-what-rules-reopening/3100631001/.
[6] Available as of the date of filing at https://www.kxan.com/news/local/hays/in-dripping-springs-the-wedding-capitol-of-texas-is-coming-back-to-life-after-covid-19/.
[7] Available as of the date of filing at https://kvoa.com/coronavirus-coverage/2020/03/24/wedding-industry-feels-impact-of-covid-19-outbreak-local-venue-speaks-out/.



Complaint                                               Case No.

21.     In an attempt to facilitate their clients' fundamental constitutional rights to marry, Plaintiff Wedgewood Weddings has contacted the Public Health Officer in each of the 15 California counties in which they operate.

22.     Plaintiff Wedgewood Weddings could not understand why a couple may have a cultural ceremony at a place of worship but not at a wedding venue;[8] why a couple may go to a restaurant and have a meal with their friends but not enjoy a meal with the same friends at a wedding venue;[9] why a couple may join thousands of strangers at in an indoor mall sharing the same bathrooms, escalators, and hand rails but not celebrate their wedding day with a select group of family and close friends at a wedding venue;[10] why a couple may visit an outdoor museum but not host their wedding at an outdoor wedding venue;[11] or why children may go to a day camp with hundreds of strangers but a couple are not allowed to have a wedding with their closest friends and family members?[12]

23.     Plaintiff Wedgewood Weddings requested clarification from various counties as to whether wedding venues could reopen, because such a venue seemed no different from the permitted businesses of entertainment venues, dine-in restaurants, outdoor businesses, and religious services. Most of the Counties did not answer. The ones that did answered with outright denials or directions to state guidelines.

24.     Los Angeles County responded to Plaintiff Wedgewood Weddings' request by stating that "Los Angeles has not reopened venues for gatherings."

---

[8] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-places-of-worship.pdf.
[9] Available as of the date of filing at https://covid19.ca.gov/pdf/checklist-dine-in-restaurants.pdf.
[10] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-shopping-centers.pdf.
[11] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-outdoor-museums.pdf.
[12] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-daycamps.pdf.

7

Complaint                                                                                    Case No.

25.     Placer County responded to Plaintiff Wedgewood Weddings' request by stating that "[u]nder the current statewide stay-at-home order, weddings are not allowed at this time."

26.     Riverside County responded to Plaintiff Wedgewood Weddings' request by stating that "[wedding] are not allowed at this stage …."

27.     Plaintiffs are willing to follow the Federal CDC guidelines in order to facilitate their clients' due process and equal protection fundamental right to marry without significant interference by the Defendants.

28.     The Defendants have provided guidance for many California industries, including but not limited to: agriculture, day camps, hotels, warehousing facilities, mining, film, places of worship, ports, public transit, retail, schools, shopping centers, among many others.[13]

29.     Wedgewood Weddings has identical precautions in place for its California locations.

30.     California only accounts for four percent (4%) of the nation's COVID-19 deaths while containing twelve percent (12%) of the nation's populace.[14] Yet weddings venues are allowed to operate in most of the United States but not in California because the Defendants have refused to provide appropriate guidance for the wedding industry, thus permitting the industry to exit the Governor's Shelter in Place Order.

///
///

---

[13] Available as of the date of filing at https://covid19.ca.gov/industry-guidance/#top.
[14] According to the CDC, California has 4,007 of the United States' 98,695 COVID-19 deaths. Available as of the date of filing at https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.  According to the U.S. Census, California has 39,512,223 of the United States' 328,239,523 people. Available as of date of filing at https://www.census.gov/quickfacts/fact/table/CA,US/PST045219.

8



Complaint                                                                                    Case No.

**Newsom Allows and Provides Reopening Guidances for Theaters, Dine-In Restaurants, Casinos, and Family Entertainment Centers**

31.     On April 28, 2020, Newsom announced a four-stage plan to reopen California businesses.[15] He set no timetable, but only stated that data would guide his reopening decisions.[16]

32.     Under his plan, the state set the standard for both timing and the type of businesses allowed to reopen.

33.     On May 7, 2020, Newsom ordered that California enter Stage Two ("State Order"), where not only "essential businesses," but also "low risk businesses" were allowed to open. (*See* May 4, 2020 Executive Order N-60-20; May 7, 2020 Health Order.)

34.     On May 12, 2020, the California Department of Public Health ("CDPH") released guidance on dine-in restaurants. (*See* CDPH Dine-In Restaurant Guidance.)[17] It sets the maximum occupancy to how many people can fit "inside" while maintaining social distancing.

35.     On June 12, 2020, the CDPH released guidance for places of worship and religious gatherings. (*See* CDPH Places of Worship Guidance.)[18] The guidance included the mandate that all indoor religious services must be capped at one hundred (100) people and not exceed twenty-five percent of the maximum total occupancy. *Id.*, p. 3.

---

[15] Available as of the date of filing at https://www.gov.ca.gov/2020/04/28/governor-newsom-provides-update-on-californiaspandemic-resilience-roadmap/.
[16] See Governor's May 7, 2020 Press Release at: https://www.gov.ca.gov/2020/05/07/governor-newsom-releases-updated-industry-guidance/.
[17] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-dine-in-restaurants.pdf.
[18] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-places-of-worship.pdf.

9



Complaint                                                                                            Case No.

36.     The CDPH also released guidelines for casinos,[19] family entertainment centers, movie theatres,[20] and gyms.[21] Movie theatres are allowed up to one hundred people as long as it does not exceed twenty five percent of maximum occupancy.

**The COVID-19 Data Available Support a Showing that Wedding Venues are Safer Than Theaters, Casinos, and Restaurants**

37.     Wedgewood Wedding's and Grand Tradition's California wedding venues are actually less at risk for COVID-19 transmission because a vast majority of the ceremonies are conducted outdoors.

38.     Public Health Departments acknowledge that outdoor businesses are safer than indoor businesses. *See e.g.*, San Mateo June 5, 2020 Health Order, Appendix C-1, heading "(7) Outdoor Dining" ("Businesses that involve outdoor interactions carry a lower risk of transmission than most indoor businesses").

39.     Open air and sunlight (whether the mechanism of action is UV radiation or thermal energy) reduce the likelihood of transmission; the open air seemingly dissipates viruses to a negligible amount,[22] while sunlight lessens the lifetime of an infectious, viral particle.[23]

40.     A study, conducted by Chinese scientists on COVID-19 clusters in Wuhan, showed that outdoor transmissions were few and rare.[24]

41.     A study on the physical-chemical structure of the SARS virus, a virus in the same family of coronaviruses as COVID-19 virus, showed that prolonged exposure

---

[19] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-casinos.pdf.
[20] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-family-entertainment.pdf.
[21] Available as of the date of filing at https://covid19.ca.gov/pdf/guidance-fitness.pdf.
[22] Available as of the date of filing at https://www.medrxiv.org/content/10.1101/2020.04.04.20053058v1.
[23] Available as of the date of filing at https://www.sciencedirect.com/science/article/pii/S016609340400179X (similar coronavirus, the one that causes the SARS outbreak, is vulnerable to UV radiation).
[24] *See*, *supra*, n.22.

10



Complaint                                                                    Case No.

to UV radiation resulted in the destruction of viral particles.[25]

42.    A Department of Homeland Security official revealed that the preliminary results from a study showed that sunlight and high temperatures could destroy a COVID-19 viral particle within minutes.[26]

43.    Unlike movie theatres or restaurants, which are both allowed under the state reopening plan, wedding venues know the identities of every guest in advance. Unlike a showing at a theatre or dinner rush at a restaurant, where people from various social groups mingle at random, wedding venues restrict each event to one, identifiable social group. These features of wedding celebrations make it easier for contact tracing, receiving attestations that guests are free from COVID-19 symptoms, and ensuring compliance with social distancing measures.

44.    A wedding venue is nothing more than a cultural ceremony and a dining experience combined. There is no basis to treat it differently from other industries which have received reopening guidance, as nothing about a wedding venue makes it inherently more dangerous than other allowed businesses and activities.  In fact, the ability to better control and identify guests makes it *easier* for contact tracing and guests' compliance with CDC guidelines, making wedding venues safer than restaurants, casinos, and movie theaters.

**Newsom's Original Shelter in Place Order Was Based on Implausible, Worst-Case Scenarios, Flawed Data, and a Flawed Model**

45.    Governor Newsom's rationale for Executive Order N-33-20, his original shelter in place order was to "bend the curve."[27] He stated that "[i]n some parts of our state, our case rate is doubling every four days," and that "[t]he point of the stay at

---

[25] *See*, *supra*, n.23.

[26] As of May 1, 2020, accessible at: https://www.reuters.com/article/us-health-coronavirus-trump/sunlight-heat-and-humidity-weaken-coronavirus-u-s-official-says-idUSKCN2253SA.

[27] March 19, 2020 press briefing at 35:17-36:00, available as of the date of filing at https://www.youtube.com/watch?v=8OeyeK8-S5o.



Complaint                                                              Case No.

home order is to make those numbers moot."[28]  The Governor added that one goal was to slowdown transmission enough to reduce the strain it might place on hospital resources.[29]

46.     Governor Newsom cited a model showing that as of March 19, 2020, 56 percent of Californians, or more than 25 million people, could be infected over the next eight weeks.[30] Dr. Mark Ghaly, the governor's Secretary of Health and Human Services, explained at the March 19th  press conference how the state came up with the 56 percent estimate. He stated "[u]sing the available literature, advice from the CDC and our understanding and experience in California, we applied a variety of different measures that looked at an attack rate [rate at which people could become infected] ...."[31]

47.     The Secretary also stated that "[w]e knew that the attack rate of 56 percent that we chose was somewhat in the middle between the high-end and the low-end of what we'd seen in the literature ...."[32]

48.     Contrastingly, several infectious disease experts, including Professor of Epidemiology John P.A. Ioannidis of Stanford University, called this an extreme, worst-case scenario that was unlikely to happen – and they turned out to be correct.[33]

49.     Upon information and belief, another piece of flawed data that drove California's and Santa Clara County's original, onerous shelter-in-place orders was an incorrect assumption that the $R_0$ of COVID-19 was 5.7.

_____

[28] *Id.*
[29] *Id.* at 5:42-8:09.
[30] *Id.* at 5:00-6:00.
[31] *Id.* at 28:49-31:11.
[32] *Id.*
[33] *Newsom: 56 % of Californians Could Get Coronavirus If Nothing Is Done*, San Francisco Chronicle, March 19, 2020, available as of May 3, 2020 at: https://webcache.googleusercontent.com/search?q=cache:sokxG9_b-2oJ:https://www.sfchronicle.com/health/article/Newsom-56-of-Californians-could-get-coronavirus-15144438.php+&cd=1&hl=en&ct=clnk&gl=us.



Complaint                                                                          Case No.

50.     The "R-naught" is the rate at which people can be infected, or more precisely the rate of reproduction of the virus as measured by infected human hosts.[34]

51.     The current $R_0$ for California is estimated to be at .98.[35]

52.     Upon information and belief, part of the data that the Governor depended on for his claim—of 25 million infections in California within eight weeks—during his March 19, 2020 announcement was the initial rate of infection in Wuhan, the originating epicenter of COVID-19.  Then and there, the numbers apparently showed a $R_0$ of 5.7.[36]

53.     However, now, the $R_0$ of COVID-19 without mitigation efforts is understood to be approximately 2.2-2.7.[37] With mitigation efforts, the $R_0$ of COVID-19 has been drive further down.

54.     More egregiously, the COVID-19 death rate projections model on which Governor Newsom relied for implementing a state of emergency and mass quarantine of healthy Californians, turned out to be grossly flawed.[38]

55.     Furthermore undermining the rationale of the Governor's Order, the World Health Organization and the European Center for Disease Control and Prevention specifically advise against "internal travel restrictions," because of limited efficacy and enormous economic and social ramifications.[39]

---

[34] https://www.nytimes.com/2020/04/23/world/europe/coronavirus-R0-explainer.html.
[35] Available as of the date of filing at https://rt.live.
[36] https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.
[37] *Id*.
[38] Available as of the date of filing at https://www.statnews.com/2020/04/17/influential-covid-19-model-uses-flawed-methods-shouldnt-guide-policies-critics-say/.
[39] "There is limited evidence for the effectiveness of internal travel restrictions, and it has legal, ethical and economic implications. Although 37% of national pandemic preparedness plans of Member States have travel restriction plans as a component of NPIs (65), the acceptability is still undetermined." World Health Organization, Nonpharmaceutical public health measures for mitigating the risk and impact of epidemic and pandemic influenza, at p. 71, available as of the date of filing at https://apps.who.int/iris/bitstream/handle/10665/329438/9789241516839-eng.pdf?ua=1;



Complaint                                                        Case No.

56.     This advice has proven correct in Sweden, which did not impose onerous lockdowns on its citizens.  This has led neither to a collapse of its hospital systems nor its economy.[40]

57.     Governor Newsom's inexplicable exclusion of wedding venues from reopening is not based in scientific facts, and arbitrary especially in light of the fact that California allows all the components of a wedding: dining, religious ceremonies, and outdoor activities.

## CLAIMS

## FIRST CLAIM FOR RELIEF

## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE

## FOURTEENTH AMENDMENT

## As enforced by 42 U.S.C. § 1983

## (By All Plaintiffs against All Defendants)

58.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

59.     The equal protection doctrine prohibits "governmental classifications that affect some groups of citizens differently than others." *Engquist v. Or. Dep't. of Agric.*, 553 U.S. 591, 601 (2008) (citations omitted). The touchstone of this analysis is whether a state creates disparity "between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609 (1974). It applies even when the government treats a "class of one" differently. *Willowbrook v. Olech*, 528 U.S. 562, 563 (2000).

60.     While the rational basis test typically applies in this context, any law that

---

see also European Centre for Disease Prevention and Control, Public Health Measures for Influenza Pandemics, p. 9, § 12 ("Internal travel restrictions [have] minor delaying effect[s and] [m]assive [costs and risks], including social disruption.").

[40] Available as of date of filing at https://www.theguardian.com/commentisfree/2020/may/15/europe-emerges-lockdown-question-hangs-was-sweden-right.

14



Complaint                                                                          Case No.

"involves a suspect classification, i.e. race, ancestry, and alienage, or … imping[es] upon a fundamental right, i.e. privacy, marriage, voting, travel, and freedom of association" triggers strict scrutiny. *Hoffman v. United States*, 767 F.2d 1431, 1434-35 (9th Cir. 1985) (citations omitted); *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (a state's denial of free public education to undocumented children was unconstitutional).

61.     It is self-evident that the right to freely come and go to operate one's business is a fundamental right and that "[f]reedom of movement is kin to the right of assembly and to the right of association. These rights may not be abridged." *See Aptheker v. Secretary of State*, 378 U.S. 500, 519-20 (1964) (Douglas, J., concurring) "Once the right to travel is curtailed, all other rights suffer, just as when curfew or home detention is placed on a person." *Id*. The right to work and operate its business is an extension of Plaintiffs' fundamental rights to liberty and property. This triggers strict scrutiny.

62.     There is no rational basis—much less a compelling reason—for allowing Californians to flock *en masse* to casinos, theaters, and restaurants while preventing Plaintiffs from providing identical services in a safer setting to clients who are exercising their fundamental right to marry and have a cultural celebration. This discriminatory treatment is resulting in a deprivation of Plaintiffs' equal protection rights.

63.     The State's irrational refusal to allow wedding venues to open in lockstep with restaurants, theaters, and casinos have resulted in Plaintiffs' constitutional rights being violated.

64.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to its constitutional rights unless Defendants are enjoined from implementing and enforcing the State Order without a reopening guidance for wedding venues.

65.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief

15



Complaint                                                                          Case No.

1  invalidating and restraining enforcement of the State Order.

2       66.     Plaintiffs found it necessary to engage the services of private counsel to

3  vindicate its rights under the law. Plaintiffs are therefore entitled to an award of

4  attorneys' fees pursuant to 42 U.S.C. § 1988.

5  **SECOND CLAIM FOR RELIEF**

6  **VIOLATION OF THE DUE PROCESS CLAUSES OF THE FIFTH AND**

7  **FOURTEENTH AMENDMENTS**

8  **Rights to liberty, property, and travel as enforced by 42 U.S.C. § 1983**

9  **(By All Plaintiffs against All Defendants)**

10       67.     Plaintiffs incorporate herein by reference each and every allegation

11  contained in the preceding paragraphs of this Complaint as though fully set forth herein.

12       68.     Plaintiffs have a fundamental interest in conducting its lawful business.

13  *Medina v. Rudman*, 545 F.2d 244, 250 (1st Cir. 1976) (*citing Paul v. Davis*, 424 U.S.

14  693 (1976)); *see also Aptheker v. Secretary of State*, 378 U.S. 500, 519-20 (1964)

15  (Douglas, J., concurring); *Connor v. Donaldson*, 422 U.S. 563, 580 (1975) *and*

16  *Robinson v. State of California*, 370 U.S. 660, 666 (1962). Thus, strict scrutiny applies.

17       69.     The State Order and Defendants' enforcement thereof violate Plaintiff's

18  substantive due process rights as follows:

19            a.  Plaintiffs are lawful businesses in the State of California, and therefore

20                have a right to lawfully pursue their businesses, a substantive due process

21                right impaired by Defendants' actions.

22            b.  Defendants lack any legitimate or compelling interest for depriving

23                Plaintiffs of their right to lawfully pursue its business.

24            c.  Even if such a legitimate, compelling interest existed, the State Order is

25                neither rationally related nor narrowly tailored to further any such interest.

26       70.     The State Order and Defendants' enforcement thereof violate Plaintiff's

27  procedural due process rights as follows:

28            a.  The State Order provides no process to request redress.

16



b.  Procedural due process, at a minimum, would permit Plaintiffs to meaningfully respond to the Order (or the continuations thereof) and explain how and why they are unconstitutional as applied to Plaintiff. However, the State Order has prevented Plaintiffs from challenging the application of the Order to it, denying it any process whatsoever before its rights were forcibly taken.

c.  Further, this taking lasts indefinitely, with the State not providing for any mechanism or opportunity to review or challenge the need to continue them in the light of developing events.

71.  Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the State Order, and/or they until promulgate guidelines for wedding venues as they have done for other businesses with equal or greater COVID-19 transmission risks.

72.  Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the State Order.

73.  Plaintiffs found it necessary to engage the services of private counsel to vindicate its rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

A.  An order and judgment declaring that the State Order, facially and as-applied to Plaintiffs, violates the Fifth and Fourteenth Amendments to the U.S. Constitution and that Plaintiffs should be allowed to conduct their business following the Federal CDC guidelines for the wedding industry;



Complaint                                                                                      Case No.

B.    An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing the State Order or otherwise interfering with Plaintiff's constitutional rights and liberties to conduct their business following the Federal CDC guidelines for the wedding industry;

C.    For attorneys' fees and costs;

D.    Such other and further relief as the Court deems appropriate and just.

Date: June 17, 2020                          DHILLON LAW GROUP INC.

                                    By:    /s/ Harmeet K. Dhillon
                                           Harmeet K. Dhillon
                                           Mark P. Meuser
                                           Gregory R. Michael

                                           GERAGOS & GERAGOS
                                           Mark Geragos
                                           Ben J. MEISELAS
                                           Matthew Vallejo

                                           Attorneys for Plaintiffs

18

Complaint                                                              Case No.

EXHIBIT 1

## EXECUTIVE ORDER N-66-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** the COVID-19 pandemic and the physical distancing measures implemented to combat it have affected governmental agencies, private businesses, and members of the public, with associated impacts on adherence to certain statutory and regulatory deadlines and other requirements; and

**WHEREAS** as a result of COVID-19, individuals seeking to obtain teacher credentials have been unable to meet certain credentialing requirements, and it is necessary to provide flexibility to minimize the impacts to these individuals and the State's supply of qualified teachers, while maintaining high teacher-credentialing standards; and

**WHEREAS** many Californians are experiencing substantial losses of income as a result of business closures, the loss of hours or wages, or layoffs related to COVID-19, hindering their ability to keep up with their rent, leaving them vulnerable to eviction, and also impacting owners reliant on rent; and

**WHEREAS** on April 16, 2020, the Department of Housing and Community Development issued guidance on relief options available to developers and property owners of Department-funded developments experiencing cash flow shortages due to decreased rental revenue as a result of COVID-19; and

**WHEREAS** certain projects and programs funded or administered through the Department of Housing and Community Development will continue to experience longer-term cash flow shortages as a result of COVID-19 and accordingly require continued and expanded administrative relief; and

**WHEREAS** said projects and programs funded or administered by or through the Department of Housing and Community Development serve essential public purposes such as promoting and maintaining affordable housing for Californians and assisting Californians experiencing or at risk of homelessness; and

**WHEREAS** the Coronavirus Aid, Relief, and Economic Stimulus (CARES) Act (Public Law 116-136) provides supplemental funding through the U.S. Department of Housing and Urban Development to the Department of Housing and Community Development's Emergency Solutions Grant and Community Development Block Grant programs to help cover higher anticipated costs and support administrative expenses related to actions to prevent, prepare for and respond to COVID-19; and

**WHEREAS** Public Law 116-136 additionally provides Community Development Block Grant recipients with new flexibilities with respect to the use of funding to support COVID-19 response; and

**WHEREAS** there remains an increased need for child care for families who may not have previously needed child care, or who may now require additional hours of child care; and

**WHEREAS** in light of the COVID-19 pandemic and stay-at-home order (issued via Executive Order N-33-20 on March 19, 2020), there remains an ongoing need to promote housing security and stability, and local jurisdictions may need to continue to take additional measures to protect public health and safety; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this Order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8571, and 8627, do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) The requirement in Education Code sections 44225(a) and 44259(b)(3) and any accompanying regulations for preliminary multiple credential candidates and preliminary single subject credential candidates to complete the Teaching Performance Assessment (TPA) is suspended for candidates whose teacher preparation program verifies that, during the 2019-20 academic year, the candidate satisfies all of the following conditions:

   (i) Was placed or employed in a local educational agency impacted by COVID-19 related school site closures;

   (ii) Was in the process of completing the TPA;

   (iii) Was unable to complete the TPA due solely to school closures; and

   (iv) Successfully completed all other preliminary teaching credential requirements.

   Candidates for whom the TPA requirement is suspended pursuant to this Paragraph 3 must complete and pass a Commission-approved teaching performance assessment prior to being recommended for a clear teaching credential.

2) The requirement in California Code of Regulations, Title 5, section 80054(a)(2)(A) and (B) for preliminary administrative services credential candidates to complete the California Administrator Performance

Assessment (CalAPA) is suspended for candidates whose administrator preparation program verifies that, during the 2019-20 academic year, the candidate:

(i)   Was placed or employed in a local educational agency impacted by COVID-19 related school site closures;

(ii)  Was in the process of completing the CalAPA;

(iii) Was unable to complete the CalAPA due solely to school closures; and

(iv) Successfully completed all other preliminary administrative services credential requirements.

Candidates for whom the CalAPA requirement is suspended pursuant to this Paragraph 4 must complete and pass a Commission-approved administrator performance assessment prior to being recommended for a clear administrative services credential.

3)   The requirements in Education Code sections 44283 and 44283.2, and California Code of Regulations, Title 5, sections 80048.3(a)(5), 80048.8, 80071.5(a)(5), and 80413(a)(4) for preliminary multiple subject credential candidates and Level 1 or preliminary education specialist credential candidates to complete the Reading Instruction Competence Assessment (RICA) are suspended for candidates who, between March 19, 2020 and August 31, 2020, were or are unable to complete the RICA due to COVID-19 related testing center closures. Candidates for whom the RICA requirement is suspended pursuant to this Paragraph must complete and pass Commission-approved reading instruction competence assessment prior to being recommended for a clear credential.

4)   The requirement in Education Code section 44252(f)(1) and any accompanying regulations for credential program applicants to complete the California Basic Educational Skills Test (CBEST) prior to admission to a Commission-approved credential program is suspended for applicants who, between March 19, 2020 and August 31, 2020, were or are unable to complete the CBEST due to COVID-19 related testing center closures. Applicants for whom the CBEST requirement is suspended pursuant to this Paragraph must complete the CBEST during their program prior to recommendation for a preliminary credential. Any use of these applicants' CBEST scores by teacher preparation programs shall be consistent with Education Code section 44252(f).

5)   The requirement in Education Code section 44453(a) and any accompanying regulations for applicants for a university intern credential program to complete a subject matter examination (CSET) prior to admission to a university intern credential program; and the requirement in Education Code section 44325(c)(3) and any accompanying regulations for applicants for a university or district intern credential to complete a CSET are suspended for applicants who, between March 19, 2020 and August 31, 2020, were or are

unable to complete the CSET due to COVID-19 related testing center closures. Applicants for whom the CSET requirement is suspended pursuant to this Paragraph must complete the CSET prior to being recommended for a preliminary credential. Additionally, notwithstanding the requirement in Education Code section 44326 that district interns teach only in the subject area for which they have met the subject matter requirement, district interns for whom the CSET requirement is suspended pursuant to this Paragraph may teach in the subject area for which they have enrolled.

6) Notwithstanding California Code of Regulations, Title 25, sections 7312(f), 8303, and 8309, the Department of Housing and Community Development shall implement financial and regulatory accommodations for projects adversely affected by the COVID-19 pandemic, including modifications to the rules regarding project reserves, in order to help maintain the projects' feasibility. Any standards and procedures developed to govern such financial and regulatory accommodations shall be exempt from the Administrative Procedures Act (Chapter 3.5 of Part 1 of Title 2 of the Government Code).

7) The requirements specified in California Code of Regulations, Title 25, sections 8402, 8403(a), 8403(c), 8403(g), 8404, 8405, 8406, 8407, 8408, and 8410(a), governing the administration of the Emergency Solutions Grant Program, shall not apply to any funds allocated pursuant to Public Law 116-136. Within 10 days of this Order, the Department of Housing and Community Development shall develop and implement new streamlined procedures and conditions for the administration of such funds. The Department shall post such procedures and guidelines on its publicly accessible website. The development and implementation of such procedures and conditions shall be exempt from the Administrative Procedures Act (Chapter 3.5 of Part 1 of Title 2 of the Government Code.

8) Health and Safety Code sections 50827(a), 50828, 50833(a), and 50833(b), requiring set-asides for economic development and housing in the Community Development Block Grant Program, shall not apply to any funding allocated pursuant to Public Law 116-136 or to funding for the 2019 or 2020 federal fiscal years that is used to respond to the COVID-19 pandemic.

9) Paragraph 1 of Executive Order N-45-20 is withdrawn and superseded by the following text:

In order to facilitate the continued provision of child care during the COVID-19 outbreak, any provision in Articles 1 through 11, 12, 15.5 through 18, 20, and 21 of Chapter 2 of Part 6 of Division 1 of the Education Code and implementing regulations in Chapter 19 and 19.5 of Division 1 of Title 5, California Code of Regulations, that restricts a child care and development program impacted by COVID-19 from serving children of essential critical infrastructure workers, as described in the document posted at https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf is suspended through June 30, 2020 (or, for families enrolled in non-

CalWORKS early learning and care services, for 60 days following the date of the child's enrollment pursuant to Paragraphs 2 and 3 of Executive Order N-47-20, whichever is longer), on the condition that services are provided consistent with an informal directive or bulletin issued by the State Superintendent of Public Instruction pursuant to SB 117 (Chapter 3, Statutes of 2020) and that costs associated with all services provided pursuant to the informal directive or bulletin are within the budget authority of the California Department of Education.

10) Paragraph 5 of Executive Order N-45-20 is withdrawn and superseded by the following text:

The requirements in Education Code section 8273 and any accompanying regulations or other written policies or procedures related to assessment of fees for families using preschool and child care and development services pursuant to Chapter 2 of Part 6 of Division 1 of the Education Code are suspended through June 30, 2020.

11) The timeframe set forth in Executive Order N-40-20, Paragraph 1, is extended for an additional 60 days from the date of this Order.

12) The timeframe set forth in Executive Order N-40-20, Paragraph 2, is extended for an additional 60 days from the date of this Order.

13) The timeframe set forth in Executive Order N-40-20, Paragraph 7, is extended for an additional 60 days from the date of this Order.

14) The timeframe set forth in Executive Order N-40-20, Paragraph 9, is extended for an additional 60 days from the date of this Order.

15) The timeframe set forth in Executive Order N-40-20, Paragraph 10, is extended for an additional 60 days from the date of this Order.

16) The timeframe set forth in Executive Order N-40-20, Paragraph 12, is extended for an additional 60 days from the date of this Order.

17) The timeframe set forth in Executive Order N-40-20, Paragraph 13, is extended for an additional 60 days from the date of this Order.

18) The timeframe set forth in Executive Order N-40-20, Paragraph 15, is extended for an additional 30 days from the date of this Order.

19) The timeframe set forth in Executive Order N-40-20, Paragraph 16, is extended for an additional 60 days from the date of this Order.

20) The timeframe for the protections set forth in Executive Order N-28-20, Paragraph 1, is extended for an additional 60 days from the date of this Order.

21) The timeframe for the protections set forth in Executive Order N-28-20, Paragraph 2 is extended for an additional 60 days from the date of this Order.

**IT IS FURTHER ORDERED** that, as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 29th day of May 2020.

_____

GAVIN NEWSOM
Governor of California

**ATTEST:**

_____

ALEX PADILLA
Secretary of State

# EXHIBIT 2



ORDER OF THE STATE PUBLIC HEALTH
OFFICER
May 7, 2020

On March 19, 2020, I issued an order directing all individuals living in the State of California to stay at home except as needed to facilitate authorized, necessary activities or to maintain the continuity of operations of critical infrastructure sectors. (See https://covid19.ca.gov/stay-home-except-for-essential-needs/.) I then set out California's path forward from this "Stay-at-Home" Order in California's Pandemic Roadmap https://www.gov.ca.gov/wp-content/uploads/2020/05/5.4.20-Update-on-Californias-Pandemic-Roadmap.pdf.That Roadmap identifies four stages of the pandemic: safety and preparation (Stage 1), reopening of lower-risk workplaces and other spaces (Stage 2), reopening of higher-risk workplaces and other spaces (Stage 3), and finally an easing of final restrictions leading to the end of the stay at home order (Stage 4).

Today, COVID-19 continues to present a significant risk to the health of individuals throughout California. There are confirmed cases of the virus in 54 of the 58 counties across the State, and each day over the past two weeks over one thousand new cases have been confirmed in California and dozens of people have lost their lives due to the virus. However, owing to Californians' mitigation efforts, statewide data currently demonstrates stable rates of new infections and hospitalizations, the maintenance of surge capacity, and an improved ability to test, contact trace, isolate, and provide support to individuals exposed to COVID-19. As State Public Health Officer, I have determined that the statewide data now supports the gradual movement of the entire state from Stage 1 to Stage 2 of California's Pandemic Resilience Roadmap.

Gradual movement into Stage 2 is intended to reintroduce activities and sectors in a phased manner and with necessary modifications, in order to protect public health and result in a lower risk for COVID-19 transmission and outbreak in a community. Such deliberate phasing is critical to allowing the State to protect the public, and to mitigate and manage the impact of the re-openings, such that our health care delivery system has the capacity to respond to potential increased demands. Differences across the state in the prevalence of COVID-19, as well as testing rates, containment capability, and hospital capacity, have resulted in differences among local health jurisdictions' ability to safely progress through the various stages. The low and stable data reported by some local health officers in their local health jurisdictions, combined with sufficient COVID-19 preparedness, justifies allowance for some variation in the speed with which some local health jurisdictions will be able to move through the phases of Stage 2.

NOW, THEREFORE, I as State Public Health Officer and Director of the California Department of Public Health, order:

1. All local health jurisdictions in the state may begin gradual movement into Stage 2, as set forth in this Order, effective on May 8, 2020; however, a local health jurisdiction may implement or continue more restrictive public health measures if the jurisdiction's Local Health Officer believes conditions in that jurisdiction warrant it.

2. I will progressively designate sectors, businesses, establishments, or activities that may reopen with certain modifications, based on public health and safety needs, and I will add additional sectors, businesses, establishments, or activities at a pace designed to protect public health and safety. Those sectors, businesses, establishments, or activities that are permitted to open will be designated, along with necessary modifications, at https://covid19.ca.gov/roadmap/, as I announce them.

3. To the extent that such sectors are re-opened, Californians may leave their homes to work at, patronize, or otherwise engage with those businesses, establishments, or activities and must, when they do so, continue at all times to practice physical distancing, minimize their time outside of the home, and wash their hands frequently. To prevent further spread of COVID-19 to and within other jurisdictions within the State, Californians should not travel significant distances and should stay close to home. My March 19, 2020, Order otherwise remains in full effect.

4.  The California Department of Public Health has set forth criteria to help local health officers assess the capacity of their local health jurisdictions to move through Stage 2. Local health jurisdictions that meet the criteria and follow the process set forth https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-19-County-Variance-Attestation-Memo.aspx will be permitted to move through Stage 2 more quickly than the State as a whole and reopen additional low-risk businesses before the rest of the state, if they choose to do so. A list of the sectors, businesses, establishments, or activities, and any necessary modifications, that such a qualifying jurisdiction may choose to reopen will be available at https://covid19.ca.gov/roadmap-counties/, and may be expanded if I deem it to be in the interest of public health and safety.

Pursuant to the authority under EO N-60-20, and Health and Safety Code sections 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this Order is to go into effect immediately and shall stay in effect until further notice.

This Order is being issued to protect the public health of Californians as we move as expeditiously to minimize risk to the extent possible throughout the Stages of the Pandemic Resilience Roadmap.

Sonia Y Angell, MD, MPH
State Public Health Officer & Director
California Department of Public Health